# IN THE UNITED STATES DISTRICT COURT FOR THE
# EASTERN DISTRICT OF OKLAHOMA

MICHAEL WAYNE SCHULZE, )
)
Petitioner, )
)
v. ) Case No. CIV 09-087-RAW-KEW
)
MIKE ADDISON, Warden, )
)
Respondent. )

## REPORT AND RECOMMENDATION

This matter is before the Magistrate Judge on petitioner's petition for a writ of habeas corpus, filed pursuant to 28 U.S.C. § 2254. Petitioner, an inmate currently incarcerated at Joseph Harp Correctional Center in Lexington, Oklahoma, attacks his conviction and sentence in Cherokee County District Court Case Number CF-2005-471 for Count 1: First Degree Arson, after former conviction of two felonies, Count 2: Assault and Battery Domestic Abuse (misdemeanor), Count 3: Assault and Battery (misdemeanor), and Count 4: Public Intoxication. He sets forth the following grounds for relief:

   I.   The evidence is insufficient to prove beyond a reasonable doubt petitioner was guilty of Count 1, Arson in the First Degree.

   II.  Petitioner's sentence of imprisonment on Count 1 should be modified, because it was based on a misleading jury instruction.

   III. The fine imposed on petitioner for Count 1, Arson in the First Degree, should be vacated or modified, because it was not authorized by law and was the result of erroneous jury instructions.

   IV.  The sentence on each misdemeanor count should be reversed or modified, because each was the result of an erroneous jury instruction.

   V.   Petitioner was prejudiced by the prosecutor's improper conduct regarding sentencing.

The respondent concedes that petitioner has exhausted his state court remedies for the purpose of federal habeas corpus review and has submitted the following records to the court for consideration in this matter:

A. Petitioner's direct appeal brief.

B. The State's brief in petitioner's direct appeal.

C. Summary Opinion affirming petitioner's judgment and sentence. *Schulze v. State*, No. F-2006-896 (Okla. Crim. App. July 19, 2007).

D. Order Dismissing Appellate Jurisdiction and Dismissing Attempted Post-Conviction Appeal. *Schulze v. State*, No. PC-2008-1180 (Okla. Crim. App. Feb. 25, 2009).

**Standard of Review**

Under the Anti-Terrorism and Effective Death Penalty Act, federal habeas corpus relief is proper only when the state court adjudication of a claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

**Ground I: Sufficiency of the Evidence for First Degree Arson**

Petitioner was convicted of the November 2005 arson of a mobile home in Cherokee County. He alleges in Ground I of his petition that the evidence was insufficient to convict him for First Degree Arson. He first raised this claim in his direct appeal, but the Oklahoma Court of Criminal Appeals (OCCA) denied relief, finding that when the evidence is taken in the light most favorable to the State, "any rational trier of fact could find that Schulze set the trailer on fire." *Schulze v. State*, No. F-2006, slip op. at 2 (Okla. Crim. App. July 19, 2007) (footnote omitted).

"Sufficiency of the evidence can be considered to be a mixed question of law and fact." *Case v. Mondagon*, 887 F.2d 1388, 1392 (10th Cir. 1989), *cert. denied*, 494 U.S. 1035 (1990). In federal habeas review of a state court conviction, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable

2

doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original).

The Supreme Court repeatedly has emphasized the deference the reviewing court owes to the trier of fact and "the sharply limited nature of constitutional sufficiency review." *Wright v. West*, 505 U.S. 277, 296 (1992) (citing *Jackson*, 443 U.S. at 319). "[A] federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume--even if it does not affirmatively appear in the record--that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Jackson*, 443 U.S. at 326. The court must "accept the jury's resolution of the evidence as long as it is within the bounds of reason." *Grubbs v. Hannigan*, 982 F.2d 1483, 1487 (10th Cir. 1993) (citing *United States v. Edmondson*, 962 F.2d 1535, 1548 (10th Cir. 1992)). "To be sufficient, the evidence supporting the conviction must be substantial; that is, it must do more than raise a mere suspicion of guilt." *Beachum v. Tansy*, 903 F.2d 1321, 1332 (10th Cir.), *cert. denied*, 498 U.S. 904 (1990) (citing *United States v. Troutman*, 814 F.2d 1428, 1455 (10th Cir. 1987)).

To determine whether there was sufficient evidence presented at trial to sustain petitioner's conviction, the court first must look to Oklahoma law for the elements required for the crime. *Jackson*, 443 U.S. at 324 n.16; *see also Torres v. Mullin*, 317 F.3d 1145, 1152 (10th Cir.), *cert. denied*, 540 U.S. 1035 (2003). The elements of Arson in the First Degree are (1) willful and malicious (2) burning of (3) a structure or contents of a building (4) that was inhabited by one or more persons (5) caused by the defendant. (O.R. 122). *See also* Okla. Stat. tit. 21, § 1401; Instruction No. 5-2, OUJI-CR (2d) (Supp. 2000).

The element at issue in this case is whether petitioner caused the fire. He argued on direct appeal and in his motion for a new trial that Brian Boss, his girlfriend's brother, actually started it.

The record shows that in November 2005 Brian Boss was living with his girlfriend Elouise Garcia in their mobile home in Cherokee County. (Tr. I 83). Eddie Monk, the landlord and owner of the mobile home park, lived in a nearby house. (Tr. I 84,87). The

3

events culminating in petitioner's conviction began when Brian's sister Martha Boss-Bond came to visit from California with petitioner, her boyfriend. (Tr. I 83-86).

The day before the fire, petitioner and Martha got into an argument, and Brian offered to take petitioner for a walk. (Tr I 88). The two men stayed out partying all night, and Elouise was angry when they returned in the morning. (Tr. I 88-89, 110, 168-69). She told Brian to get his belongings and move out, and she called the police to assist in removing him from their mobile home. (Tr. I 88, 110, 117). When the police asked Brian to leave the premises, Martha heard Brian say he knew where Elouise would be in the trailer. (Tr. I 164).

That evening petitioner and Martha drank whiskey, with petitioner drinking a significant amount. (Tr. I 89-90, 109-110, 147, 170). He began playing loud music that Elouise did not understand or like, so she went to Kevin Johnson's mobile home next door to spend the evening. (Tr. I 86, 91, 122). The music included a song about "burning up and dying" with a lover. (Tr. I 91). When Elouise returned to her trailer on several occasions, petitioner insisted that she listen to the music. (Tr. I 90-91).

Martha heard petitioner tell Elouise that he hated Martha and wanted to go home, as he became increasingly fidgety and angry. (Tr. I 148-49). When Elouise left the mobile home, petitioner pushed Martha into the kitchen wall and grabbed her by her hair. (Tr. I 149). He then went outside and again told Elouise he wanted to go home. (Tr. I 149). Both Martha and Elouise unsuccessfully attempted to calm him, so Martha went back inside Elouise's home to call her father and ask him to get her away from petitioner. (Tr. I 149-50). Petitioner ran into the house, ripped the telephone from the wall, threw Martha into the wall, grabbed her by her hair, and hit her in the head with the phone. (Tr. I 150). When she was able to get free, she ran out the door. (Tr. I 151). Petitioner left with his backpack and motorcycle helmet. (Tr. I 151). Martha ran next door to talk to Elouise and Kevin. (Tr. I 151).

Petitioner went to Kevin's mobile home and was "ranting and raving" that he hated Martha and wanted Elouise to take him back to California, but Elouise said she could not do so. (Tr. I 91-92). Petitioner grabbed his backpack and left. (Tr. I 92). Kevin got into his

4

truck and went to find petitioner and take him to the bus station. (Tr. I 92-93, 123, 135, 151).

With Kevin gone, petitioner returned and started yelling at Martha that he hated her. (Tr. I 93, 151). He grabbed her, pushed her around, and hit her twice in the face with his fist. (Tr. I 93-95, 151-52, 172-73). Petitioner then began hitting himself in the face, and left Kevin's mobile home, with the altercation continuing outside. (Tr. I 95-96, 152). Elouise ran to the trailer where Brian was staying and asked him to intervene. (Tr. I 96-97). Brian talked with Martha and petitioner to no avail before returning to the mobile home where he was staying. (Tr. I 97, 152-53).

When Kevin returned, he saw Elouise coming out of his trailer and Martha leaving Elouise's trailer. (Tr. I 136). Petitioner followed Martha out of Elouise's trailer, and Kevin heard both women screaming. (Tr. I 136). While petitioner was yelling at Martha from the porch, Kevin noticed petitioner repeatedly looked "down inside the house to the floor." (Tr. I 130). Martha said petitioner was going to kill her, so Kevin told both women to follow him to the landlord's house, where he was going to ask the landlord to call the police. (Tr. I 98-100, 124, 137). Martha, however, did not go to the landlord's house with Kevin and Elouise, and Kevin did not know where she was. (Tr. I 124, 137).

Martha testified that as soon as petitioner turned his back, she ran and hid between a motor home and a trailer. (Tr. I 153). She found his helmet on the ground, and sat on it while he was yelling that she had better come back, because she could not leave him, and they would die together. (Tr. I 153-54, 173). Petitioner went to Elouise's trailer to get his belongings. (Tr. 154). Martha tried to run away, but he started chasing her with a screwdriver "like a madman" and saying he was going to kill both of them that night by burning them in the trailer. (Tr. I 154-158; Tr. II 202-03). She yelled that he was trying to kill her. (Tr. I 155; II 205). Her clothes were caught when she jumped a fence, but the landlord stepped between her and petitioner. (Tr. I 156). Petitioner punched the landlord, saying nobody was "going to tell him what he can't do to his girlfriend." (Tr. I 156, 174; Tr. II 203). The landlord took Martha by the hand and walked her to his house to get his

5

shotgun. (Tr. II 204). When the landlord went back outside with his gun, Kevin said he thought Elouise's trailer was on fire. (Tr. II 204). Petitioner was standing by the street, and the landlord asked him what he had done. (Tr. II 204). Petitioner answered, "I set those people's house a fire [sic]." (Tr. II 204).

The landlord told Kevin they needed to try to keep the fire back, to prevent Kevin's home from burning down, and they started looking for a water hose to connect. (Tr. II 205-06). Kevin then ran back inside the landlord's house to get the landlord's wife to call the fire department. (Tr. II 207). Elouise, Kevin, and the landlord saw Brian running barefoot out of the mobile home where he was staying, pulling up his pants and yelling for Elouise, because he thought she was in the burning trailer. (Tr. I 104, 131, Tr. II 206). Firefighters arrived and extinguished the fire around 10:30 p.m., but the mobile home and its contents were almost a total loss. (Tr. I 104, 141; Tr. II 230-31).

Petitioner left and did not return to the mobile home park until around 2:00 or 3:00 a.m. (Tr. I 102, 131, Tr. II 192). He knocked on the door of Kevin's mobile home and asked to see Martha, who was there with Elouise. (Tr. I 131-132, 160). Elouise told petitioner through a locked sliding glass door that Martha was at the landlord's house. (Tr. I 132, 160). Petitioner tried to jimmy the door, and said, "If you want to see someone get killed tonight just watch," before walking toward the landlord's house. (Tr. I 132, 160-61). Kevin told the two women to get in his truck, and they drove out of the mobile home park. (Tr. I 133, 160). Petitioner stepped in front of the vehicle, and Kevin swerved his truck. (Tr. I 133, 160).

Martha testified that after the fire, petitioner sent her several letters, threatening that she had better tell the authorities that Brian started the fire. (Tr. I 165). She, however, had no personal knowledge of Brian's involvement. (Tr. I 165-66).

Agent Sam Pinson of the State Fire Marshal's Office testified that the Sheriff's Department called him to investigate the fire. (Tr. II 217, 219). When he arrived, some of the fire still was burning, and petitioner had fled the scene. (Tr. II 219). He returned the next morning and took statements and photographs. (Tr. II 220). Based upon his investigation,

6

Agent Pinson believed the fire started in the living room, right inside the front door, and the fire was caused by arson. (Tr. II 225, 231). A few hours after petitioner's arrest the morning after the fire, Pinson questioned him at the Cherokee County Jail. (Tr. 225-28). Petitioner told Agent Pinson, "[I]f it was done, I probably did it." (Tr. II 230).

The defense called petitioner's bail bondsman Jimmie Fite. (Tr. II 237). He testified that about three weeks before petitioner was bonded, Martha called him and said she believed her brother Brian either started the fire or was responsible for the fire, and he had fled to California immediately afterward. (Tr. II 237-38). Martha also told Fite that Brian was a meth cook, and chemicals were in the trailer. (Tr. II 239).

Elouise testified in rebuttal that she had lived in the trailer for approximately four months before the fire. (Tr. II 240). She saw absolutely no evidence of a methamphetamine lab or any chemical associated with the manufacture of methamphetamine in the house. (Tr. II 240).

After careful review of the record, the court finds the evidence was sufficient under the standard of *Jackson v. Virginia*. Therefore, the determination of this issue by the Oklahoma Court of Criminal Appeals was not contrary to, or an unreasonable application of clearly established federal law, and the OCCA's decision was not based on an unreasonable determination of the facts presented in state court. *See* 28 U.S.C. § 2254(d). Ground I of this petition fails.

### Grounds II, III, and IV: Erroneous Jury Instructions Resulted in Improper Sentences for Counts 1, 2, and 3:

Petitioner alleges in Ground II that his sentence of 45 years for Arson was based on a misleading jury instruction, because the trial court failed to use the specific statutory language to inform the jury of the range of punishment. He claims in Ground III that the $25,000 fine imposed for his Arson conviction was not authorized by law, and the jury was not correctly instructed on the law. In Ground IV he contends the sentences of jail time and fines for his misdemeanor convictions in Counts 2, 3, and 4 resulted from an erroneous jury

7

instruction.

On direct appeal the OCCA found "the trial court erred in instructing jurors Schulze could be sentenced to any number of years rather than life imprisonment." *Schulze v. State*, No. F-2006-896, slip op. at 2 (footnote omitted). This error, however, did not require relief. *Id.* Noting that the Arson statute expressly provides for a fine of no more than $25,000, the OCCA found no error "in instructing jurors that they could recommend a fine of no more than $25,000" for the Arson conviction. *Id.* Furthermore, "the trial court did not err in instructing jurors that, if they found Schulze had prior convictions, they could recommend imprisonment and a fine." *Id.* at 2-3 n.4.

Regarding the punishment for petitioner's misdemeanor convictions for Assault and Battery (Count 3) and Public Intoxication (Count 4), the OCCA found the jury was not instructed on the correct range of punishment. *Id.* at 3. The instructions erroneously implied that a fine was required. *Id.* Although petitioner did not object to the instructions, the OCCA found the error required relief and modified those sentences by vacating the fines. *Id.* at 2-3.

The respondent asserts petitioner's challenge to his sentences is a matter of state law that presents no federal constitutional issue cognizable on federal habeas corpus review. This court agrees. A federal habeas court affords "wide discretion to the state trial court's sentencing decision, and challenges to the decision are not generally constitutionally cognizable, unless it is shown that the sentence imposed is outside the statutory limits or unauthorized by law." *Dennis v. Poppel*, 222 F.3d 1245, 1258 (10th Cir. 2000). Habeas corpus review generally ends "once we determine the sentence is within the limitation set by statute." *Id.* Grounds II, III, and IV are meritless.

**Ground V: Prosecutorial Misconduct**

In Ground V petitioner alleges he was prejudiced by the prosecutor's improper statement that the jurors had a duty to impose a severe punishment. Without discussion, the OCCA found there was no improper argument from the prosecutor. *Schulze*, No. F-2006, slip op. at 3 & n.6.

8

On direct appeal petitioner complained of the prosecutor's statement regarding the imposition of a severe punishment. The record shows, however, that the prosecutor argued the evidence showed petitioner had two prior convictions, and that when combined with the jury's determination that he had committed Arson in the First Degree, the jury had the "ability" and the "authority" "to stop [him]" with an "appropriate" sentence of 60 years. (Tr. II 281).

Petitioner next complained he was prejudiced by the prosecutor's allegedly misleading argument about the sentencing range. He claimed the prosecutor's suggestion that the jurors add 20 years to the minimum recidivist sentence for each prior conviction misled the jurors into thinking the minimum sentence did not include enhancement for the prior convictions. Jury Instruction No. 20, however, made it clear that the minimum sentence available for First Degree Arson increased with each prior conviction proven to the jury. (O.R. 135-36). Because "a jury is presumed to have followed its instructions," *Weeks v. Angelone*, 528 U.S. 225, 234 (2000), there is no basis to conclude the jurors were misled by the prosecutor's comments. In addition, the jury's 45-year sentence was significantly less that the 60 years requested by the prosecutor.

Finally, petitioner alleged on direct appeal that the prosecutor's comment in the first stage closing arguments that petitioner "needs to feel the wrath of your verdict" was inflammatory and led to unfair sentences. (Tr. II 266). The respondent contends the statement simply suggested that the evidence proved petitioner was guilty as charged, and the jury should find him guilty of the acts, thereby causing him to realize his conduct was unlawful.

> In a habeas corpus action, claims of prosecutorial misconduct are reviewed only for a violation of due process. *See Darden v. Wainwright*, 477 U.S. 168, 181 (1986). "[N]ot every trial error or infirmity which might call for application of supervisory powers correspondingly constitutes a failure to observe that fundamental fairness essential to the very concept of justice." *Donnelly v. DeChristoforo*, 416 U.S. 637, 642 (1974) (citations and quotations omitted). In order to be entitled to relief, [petitioner] must establish that the prosecutor's conduct or remarks "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id.* at 643. This

> determination may be made only after considering all of the surrounding circumstances, including the strength of the state's case. *See Darden*, 477 U.S. at 181-82.

*Malicoat v. Mullin*, 426 F.3d 1241, 1255 (10th Cir. 2005), *cert. denied*, 547 U.S. 1181 (2006). After careful review of this issue, the court finds there is no basis for relief.

**Supplemental Claims: Ineffective Assistance of Appellate Counsel**

Petitioner has supplemented his petition with claims of ineffective assistance of appellate counsel. He alleges his appellate counsel was ineffective in failing to follow OCCA rules regarding an application for an evidentiary hearing on newly-discovered evidence that Brian Boss actually set the fire. Appellate counsel also allegedly failed to raise a claim that trial counsel was ineffective in failing to introduce evidence of this "third-party defense." He admits his appellate counsel filed an appellate brief, a motion for a new trial on newly-discovered evidence, a brief in support of the motion, and affidavits to support the allegations that Brian Boss was the culprit. He claims, however, that appellate counsel's failure to request an evidentiary hearing doomed his "third party defense.

The record shows that petitioner first raised his ineffective assistance of counsel claims in his first application for post-conviction relief that was filed on June 24, 2008, and denied on August 19, 2008. A final order denying the application was entered by the trial court on October 23, 2008. Petitioner, however, did not appeal the denial until December 11, 2008. The OCCA declined jurisdiction and dismissed the attempted appeal, because he had failed to file a timely appeal in accordance with the OCCA's rules. *Schulze v. State*, No. PC-2008-1180 (Okla. Crim. App. Feb. 25, 2009) (citing Rule 5.2(C), *Rules of the Court of Criminal Appeals*, Okla. Stat. tit. 22, ch.18, App. (2009)).

The respondent alleges petitioner's supplemental claims are procedurally barred, because petitioner failed to follow OCCA rules for perfecting a post-conviction appeal of the claims. Petitioner argues he was unable to comply with the OCCA rules, because he did not receive a copy of the August 19, 2008, order denying his post-conviction application. The OCCA, however, specifically found that the final order denying post-conviction relief was

entered on October 23, 2008, *Schulze*, No. PC-2008-1180, slip op. at 1, and petitioner makes no claim in this habeas petition that he did not receive a copy of the later order.

Petitioner filed a third application for post-conviction relief in the trial court on November 23, 2010, seeking a post-conviction appeal out of time and arguing the August 19, 2008, order was not served on him within ten days of entry. In its order affirming the denial of petitioner's third post-conviction application, the OCCA noted petitioner had offered no explanation why this issue was not raised in his first post-conviction appeal, filed on December 11, 2008. *Schulze v. State*, No. PC-2011-701, slip op. at 2 (Okla. Crim. App. Oct. 10, 2011). Furthermore, petitioner did not argue he did not receive the order within the 30-day limit for filing an appeal with the Court of Criminal Appeals. *Id.* The OCCA found petitioner had failed to show he was denied an appeal through no fault of his own, or that he ever attempted to appeal the August 2008 order. *Id.* slip op. at 2-3.

> In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

*Coleman v. Thompson*, 501 U.S. 722, 750 (1991). The Oklahoma Court of Criminal Appeals denied relief for petitioner's failure to comply with procedural rules. This state procedural default for failure to comply with Rule 5.2(C) was both "independent" and "adequate." *See Johnson v. Champion*, 288 F.3d 1215, 1227 n.3 (10th Cir. 2002)

"'[C]ause' under the cause and prejudice test must be something *external* to the petitioner, something that cannot fairly be attributed to him." *Id.* 501 U.S. at 753 (emphasis in original). With respect to the "prejudice" prong of the "cause and prejudice" requirement, a petitioner "must shoulder the burden of showing, not merely that the errors at his trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982) (emphasis in original). The court finds that application

of the procedural bar by the Court of Criminal Appeals was based on state procedural rules, and petitioner has not shown cause for the default. Having failed to demonstrate cause for his procedural default, the issue of prejudice need not be addressed. *See Steele v. Young*, 11 F.3d 1518, 1522 n.7 (10th Cir. 1993).

The court further finds that petitioner has failed to demonstrate that application of the procedural bar will result in a fundamental miscarriage of justice. The Tenth Circuit Court of Appeals has held that "[c]ases involving a fundamental miscarriage of justice 'are extraordinary instances when a constitutional violation probably has caused the conviction of one innocent of the crime.'" *Gilbert v. Scott*, 941 F.2d 1065, 1068 n.2 (10th Cir. 1991) (citing *McClesky v. Zant*, 499 U.S. 467, 494 (1991)). The Tenth Circuit has explained this "very narrow exception" as follows:

> [T]he petitioner must supplement his habeas claim with a colorable showing of factual innocence. Such a showing does not in itself entitle the petitioner to relief but instead serves as a "'gateway'" that then entitles the petitioner to consideration of the merits of his claims. In this context, factual innocence means that "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt."

*Demarest v. Price*, 130 F.3d 922, 941-42 (10th Cir. 1997) (internal quotations omitted). The court finds petitioner has not made a colorable showing of factual innocence, so relief cannot be granted. *See Herrera v. Collins*, 506 U.S. 390, 404 (1993); *Kuhlmann v. Wilson*, 477 U.S. 436, 454 (1986). Petitioner's supplemental claims are procedurally barred.

**ACCORDINGLY**, the Magistrate Judge recommends that this action be, in all respects, dismissed.

Pursuant to 28 U.S.C. § 636(b)(1)(C), the parties are given fourteen (14) days from being served with a copy of this Report and Recommendation to file with the Clerk of the Court any objections with supporting briefs. Failure to file timely written objections to the Magistrate Judge's recommendations may result in waiver of appellate review of factual and

legal questions. *Talley v. Hesse*, 91 F.3d 1411, 1412-13 (10th Cir. 1996); *Moore v. United States*, 950 F.2d 656, 659 (10th Cir. 1991).

**DATED** this 26th day of January 2012.

KIMBERLY E. WEST
UNITED STATES MAGISTRATE JUDGE